# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| TGI SYSTEMS CORPORATION, | ) |
| Plaintiff, | ) |
| vs. | ) Case No. 15 C 4341 |
| JENS GIESSLER and NEUMANN & MULLER GmbH & Co.KG, | ) |
| Defendant. | ) |

## MEMORANDUM OPINION AND ORDER

MATTHEW F. KENNELLY, District Judge:

TGI Systems Corporation has sued Jens Giessler and Neumann & Muller (N&M) for fraud and, in the alternative, breach of contract. TGI's claim arises from defendants' allegedly knowing misrepresentations aimed at increasing the price on an agreement between TGI and defendants.

TGI was a party to a contractual agreement to provide LED displays at the 2009 Confederations Cup and the 2010 World Cup. TGI subcontracted with defendants to procure and deliver the LED systems. For reasons that are disputed, defendants charged TGI more than the bargained-for price and allegedly interfered with TGI's efforts to locate other providers. TGI, which was bound by its own obligations under the separate World Cup contract, says it begrudgingly obliged and paid defendants their increased asking price. Defendants' sudden increase in price and the communications surrounding that event form the basis of TGI's claims in this lawsuit.

Defendants have moved to dismiss for lack of personal jurisdiction, lack of proper

venue, and based on the doctrine of *forum non conveniens*. For the reasons stated below, the Court denies defendants' motion in its entirety.

**Background**

TGI is a graphic design company with offices in Illinois, California, and Germany. During the events relevant to this case, TGI had offices only in Illinois. In or about 2007, TGI entered into a contract with the Federation Internationale de Football Association (FIFA) to provide signage for FIFA's 2009 Confederations Cup and 2010 World Cup in South Africa. Under this contract, TGI was to provide static and rotational signs. The contract provided that if FIFA decided to switch to LED signage, TGI would have the opportunity to provide it. In or about 2008, FIFA decided to use LED signage and informed TGI that it intended to use AIM Marketing to provide it. TGI objected, contending that FIFA's decision to outsource the LED signage was a breach of the 2007 contract.

After TGI's protest, FIFA and TGI entered into a new agreement under which TGI would provide the signage for both tournaments only if it used AIM Marketing and its sister company AIM International, A.G., as a subcontractor to supply the LED systems. AIM had minimal staff, so it contracted with N&M to provide support for much of the services it supplied to TGI. AIM and N&M had been business partners before the 2009 Confederations Cup, having worked together to supply LED signage to soccer teams in Germany. AIM and N&M allegedly planned to work together and share profits generated from the systems after the 2009 and 2010 competitions.

For the Confederations Cup, TGI acted primarily as a coordinator for the shipments; FIFA paid all transportation expenses for the systems' shipments. N&M was

identified as a consignor for the systems during the Confederations Cup.  The payment scheme remained somewhat similar for the World Cup, except that FIFA would pay the first $1,100,000 in transportation expenses, and AIM would pay for expenses over and above $1,100,000.  TGI remained responsible for coordinating transportation of the systems.  Ten systems were to be shipped to South Africa, with three used systems coming from Germany and seven new systems coming from China.

In February 2010, AIM took the position that TGI was required to act as consignor for the AIM-owned and controlled LED systems that were being shipped from Germany and China.  TGI refused, claiming that acting as consignor would subject it to a German tax that it did not want to pay.  N&M then offered to provide services for TGI, including locating consignors and preparing the systems for shipment.  TGI rejected N&M's offer, and it began searching for alternative consignors.

TGI was able to locate another consignor for the three LED systems that were coming from Germany.  According to TGI, however, N&M blocked its efforts to find an alternative consignor for the seven systems coming from China.  Even when TGI found prospective consignors, N&M allegedly refused to release the systems or the information necessary for the consignors to arrange for their shipment.

As the deadline for TGI to have the LED systems in South Africa for the World Cup approached, TGI says, it was left with no choice but to reconsider N&M's offer.  TGI's president contacted N&M's senior manager and partial owner Jens Giessler to inquire about the company's previous offer (made on May 13, 2010) and to get an understanding of the purpose of certain charges contained in the offer.  Giessler responded with an e-mail, stating that N&M would charge 2,000 Euros ($2,514) per day

3

to provide detailed responses to TGI's questions. Giessler also suggested that TGI pay 100,000 Euros ($125,743) by May 17 to allow N&M to begin working. TGI made the initial payment of $126,450 to N&M because it had no other meaningful options to fulfill its obligations under the FIFA contract. N&M demanded that TGI make another payment of a little under 100,000 Euros ($113,252.47) three days later, which TGI paid.

The parties exchanged communications over the course of the next two weeks, all via e-mail. TGI attempted to arrange for one of N&M's associates to act as the consignor free of charge, as had been offered previously, but N&M rebuffed this proposal. Finally, on May 26, 2010, Giessler offered to retain a Chinese company as consignor if TGI paid $500,000 to N&M. TGI says that because just nine days remained before the deadline for the LED systems to arrive in South Africa, it had no choice but to oblige. But before accepting, TGI sent an e-mail to Giessler objecting to the $500,000 price. TGI also had its counsel send a letter to FIFA demanding that FIFA or AIM pay the fee. FIFA refused, and it demanded that TGI pay the fee or face full liability for any failure of the LED systems to arrive in South Africa in time for the World Cup. This liability, TGI says, could have ranged from $10,000,000 to $100,000,000. Given the time crunch and N&M's continuous blocking of TGI's efforts to find an outside consignor, TGI alleges it had no choice but to pay N&M its asking price.

Several times over the course of the next few months, TGI unsuccessfully sought to learn the identity of N&M's chosen consigner. Each time TGI's representative asked Giessler for the consignors' identity, he refused to provide the information. Giessler claimed that he could not disclose the information without AIM's permission. In or about July 2010, TGI learned that AIM had been the consignor.

4

According to TGI, substantially all of the statements made by Giessler and TGI in connection to the fees for a consignor were knowingly false and intended to place TGI in a position where it had no meaningful choice but to pay the monies demanded by N&M. TGI alleges that if it had known the truth, it would not have paid N&M's asking price and instead would have placed more pressure on FIFA to cover the consignor costs. TGI filed this lawsuit in July 2015.

## Discussion

Defendants have moved to dismiss for lack of personal jurisdiction, improper venue, and under the doctrine of *forum non conveniens*. Defendants argue that their dealings with TGI provide insufficient contacts with Illinois to permit TGI to sue them here. Defendants also argue that the TGI/AIM agreement requiring disputes under that agreement to be resolved by arbitration should apply and the present dispute between TGI and defendants under principles of agency and estoppel. Finally, defendants contend that the case should be dismissed under the doctrine of *forum non conveniens* because there is an adequate alternative judicial forum in which to adjudicate the dispute. The Court addresses each argument in turn.

### 1. Personal jurisdiction

The plaintiff has the burden of establishing personal jurisdiction. *Tamburo v. Dworkin*, 601 F.3d 693, 700 (7th Cir. 2010). "[W]here, as here, the issue is raised on a motion to dismiss and decided on the basis of written materials rather than an evidentiary hearing, the plaintiff need only make a prima facie showing of jurisdictional facts." *Id.* The Court takes as true all well-pleaded facts alleged in the complaint and resolves any factual disputes in favor of the plaintiff. *Id.*

In the absence of a federal statute authorizing nationwide service of process, personal jurisdiction is governed by the law of the forum state. *Id.* The court's exercise of jurisdiction over the defendant must be authorized by the terms of the forum-state's personal jurisdiction statute and also must comport with the requirements of the Fourteenth Amendment's Due Process Clause. *See, e.g., Felland v. Clifton*, 682 F.3d 665. 672 (7th Cir. 2012). Because Illinois' long-arm statute permits the exercise of jurisdiction to the full extent of the Fourteenth Amendment's Due Process Clause, the two inquiries merge. *Tamburo*, 601 F.3d at 701. As such, the Court must determine whether defendants have sufficient minimum contacts with Illinois such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice. *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945).

### a. Specific jurisdiction analysis

The parties appear to agree that the Court does not have general jurisdiction over the defendants. Rather, TGI argues that the Court has specific jurisdiction over the defendants. "Specific jurisdiction is appropriate where (1) the defendant has purposefully directed his activities at the forum state or purposefully availed himself of the privilege of conducting business in that state and 2) the alleged injury arises out of the defendant's forum-related activities." *Tamburo*, 601 F.3d at 702 (citing *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472 (1985)).

The jurisdictional issue in this case primarily turns on whether the defendants purposefully directed their activities at Illinois. In a case involving an alleged intentional tort, constitutionally sufficient contacts can be imputed to a defendant if he is accused of actions that are "expressly aimed" at the forum state. *Mobile Anesthesiologists Chi.*

6

*LLC v. Anesthesia Assoc. of Houston Metroplex, P.A.*, 623 F.3d 440, 444 (7th Cir. 2010) (citing *Calder v. Jones*, 465 U.S. 783, 789-90 (1984)). In particular, specific jurisdiction exists if plaintiff's injury arose from defendants' intentional conduct that was expressly aimed at the forum state and was conducted with knowledge that "the effects would be felt—that is, that the plaintiff would be injured—in the forum state." *Tamburo*, 601 F.3d at 703.

Defendants argue that the Court lacks specific jurisdiction over them because they do not have sufficient contacts in Illinois, they did not purposefully direct their conduct at Illinois, and the exercise of jurisdiction would offend traditional notions of fair play and substantial justice. Defendants note that they do not have business offices or agents in Illinois. They also contend that N&M has never solicited business with TGI or sales in the Illinois market. Defendants also point a variety of other things they did not do—travel to Illinois, do business with other companies in Illinois, etc.—to establish that they did not purposefully direct their business at this state.

For its part, TGI argues that defendants' decision to engage in a business relationship with an Illinois company and send a series of e-mails to carry out a scheme to defraud that company is sufficient to establish specific jurisdiction. TGI argues that defendants knew it was headquartered in Illinois, pointing to correspondence N&M sent to TGI with its Illinois address printed at the top. TGI is a Chicago-based company with nearly all of its employees here. Although TGI now has other locations as well, it argues that there could have been no confusion at the relevant time regarding its location because it had not yet expanded beyond Illinois. Therefore, according to TGI, defendants knew they were sending e-mails to be read in Illinois by an Illinois company

and to perpetrate a scheme whose adverse effects would have been felt in Illinois by TGI, an Illinois-based entity.

*Tamburo* specifically addressed contact via the Internet, holding that "tortious acts aimed at a target in a forum state and undertaken for the express purpose of causing injury there are sufficient to satisfy *Calder*'s 'expressly-aimed' requirement." *Id.* at 707. As indicated earlier, the Court takes as true for purposes of the motion to dismiss TGI's factual allegations, in particular its allegations that defendants made a series of fraudulent statements to TGI via e-mail for the purpose of inducing it to pay them nearly $750,000. These allegations are sufficient to support specific jurisdiction, irrespective of whether defendants had physical meetings in Illinois or locations or agents in this state.

Defendant's argument that their communications with TGI were only responses to TGI's inquiries does not defeat jurisdiction either. Here, as in *Felland*, the plaintiff initiated contact with the defendants in an effort to move the pre-arranged agreement along. *See Felland*, 682 F.3d at 671. But in the present circumstances, who initiated contacts is not controlling. Both here and in *Felland*, it was the defendants' allegedly false communications in response to TGI's inquiries that perpetrated the alleged fraudulent scheme. Via these communications, defendants allegedly misrepresented and concealed material facts in an effort to extract more money from TGI. If one takes the allegations in the complaint as true, the defendants knew that the effect of its alleged scheme would be felt in Illinois, which was TGI's sole business location at the time. Given these circumstances, defendants purposefully directed their activities at Illinois such that they reasonably could have expected to be haled into court in this

8

state.

### b. Fiduciary shield issue

Giessler argues that even if personal jurisdiction exists for N&M, it does not exist for him under the fiduciary shield doctrine. The fiduciary shield doctrine is a limitation on Illinois' long-arm statute that prevents courts from exercising jurisdiction over a non-resident when that person's only contact with Illinois is by virtue of his acts as a fiduciary of a corporation. *See, e.g., Plastic Film Corp. v. Unipac, Inc.*, 128 F. Supp. 2d 1143, 1146 (N.D. Ill. 2001). But the fiduciary shield doctrine does not apply when the defendant is an owner or shareholder in a corporation or has a direct financial stake in the action at issue or the company's health. *Id.* at 1147; *see Kohler Co. v. Kohler Int'l, Ltd.*, 196 F. Supp. 2d 690, 699 (N.D. Ill. 2002) (listing a variety of interests and positions that would preclude a defendant from successful invoking the fiduciary shield). TGI has alleged that Giessler is a part-owner of N&M, an allegation that the Court must as true at this stage of the case. The Court also notes that in their reply brief, defendants make no effort to rebut TGI's arguments against the application of the fiduciary shield doctrine, indicating that they have conceded the point. One way or another, the Court concludes that the fiduciary shield doctrine does not preclude the exercise of personal jurisdiction over Giessler.

### 2. Improper venue / arbitration

Defendants argue that a binding arbitration agreement covers TGI's claims against them, making this Court an improper forum for adjudication of the case. The parties in this case did not enter into an agreement to arbitrate their disputes. Rather, defendants cite the arbitration agreement in the TGI/AIM contract, to which N&M and

9

Giessler were not parties. Generally, non-signatories cannot enforce arbitration agreements. *Affymax, Inc. v. Johnson & Johnson*, 420 F. Supp. 2d 876, 881 (N.D. Ill. 2006) (Kennelly, J.) (recognizing that ". . . a party cannot ordinarily compel arbitration unless it is a party to a contract with an arbitration clause . . ." before listing the limited exceptions to that rule).

Defendants argue, correctly, that the "Seventh Circuit has recognized multiple grounds on which an arbitration agreement may apply to claims involving a non-signatory." Defs.' Mot. at 18. They cite the doctrines of equitable estoppel and agency in seeking to enforce the AIM/TGI arbitration provision in this case.

    **a.**    **Equitable estoppel**

The doctrine of equitable estoppel "allows a non-signatory to compel arbitration when a signatory's claims are grounded in or intertwined with the terms of the written agreement." *Affymax, Inc.*, 420 F. Supp. 2d at 881. In *Affymax*, this Court concluded that equitable estoppel applies in this context in two circumstances: 1) when the signatory relies on the terms of the written agreement in asserting its claims against the non-signatory, and 2) when the signatory raises allegations of substantially interdependent and concerted misconduct by both the non-signatory and one or more of the signatories to the contract. *Id.* at 882. Here, the signatory, TGI, does not rely on the terms of its contract with AIM in asserting its claims against N&M and Giessler. Though the relationships at issue in this case would not have arisen without the existence of the AIM contract, the conduct challenged in this case is independent of that contract. And although TGI has alleged that the AIM had a business relationship with the defendants and stood to benefit from their dealings with TGI after the World Cup, TGI does not

10

allege that the events at issue here involved interdependent or concerted misconduct along with AIM. In short, although TGI ended up dealing with defendants as a result of its contract with AIM, that does not mean that its claims rely on or intertwined with that contract. Rather, as TGI accurately notes, its claims against the defendants stem from alleged false statements concerning issues that were not covered by the AIM contract, concerning finding a consignor and legal requirements for shipping from China. In sum, the doctrine of equitable estoppel does not apply, and defendants cannot enforce the AIM/TGI arbitration agreement via that doctrine.

      **b.**      **Agency**

Defendants also argue that they should be able to enforce the arbitration agreement because they were AIM's agents. An agent can obtain the benefit of an arbitration agreement between its principal and a third party. *Janiga v. Questar Capital Corp.*, 615 F.3d 735, 743 (7th Cir. 2010). The issues—aside from whether the claims are covered by the language of the TGI/AIM agreement—are whether defendants were AIM's agents and whether the claims they assert are within the scope of their agency. *Id.*

To establish that they were agents of AIM's, defendants point to two statements that TGI made in its complaint: "AIM and N&M were business partners," and "N&M had agreed that N&M would be AIM's agent in leasing and providing associated services for the LED systems after they were used in the Confederations Cup and World Cup." First Am. Compl. ¶¶ 11, 12. These statements, according to the defendants, establish that defendants were acting as AIM's agents. The Court disagrees. The assertion that AIM and N&M were "business partners" does not mean that N&M was, legally speaking,

under the control of AIM or acting for its benefit—the key elements—with regard to the conduct underlying the claims asserted here. *See, e.g., Meyer v. Holley,* 537 U.S. 280, 286 (2003) ("[T]he relevant principal/agency relationship demands not only control (or the right to direct or control) but also the manifestation of consent by one person to another that the other shall act on his behalf, and consent by the other to so act.") (internal quotation marks omitted).

Additionally, the assertion that defendants would be AIM's agents after the relevant contractual period ended, even if true, would not entitle defendants to benefit from provisions in AIM's then-expired agreements. The anticipated future relationship between AIM and defendants does not reflect the status of their relationship at the time of the conduct at issue in this case.

In sum, defendants have failed to establish that they AIM's agents at the relevant time, or that the claims TGI asserts involve conduct within the scope of their purported agency. They are not entitled to enforce the AIM/TGI arbitration agreement with regard to TGI's claims in this case.

### c. Effect of Swiss law

The discussion above establishes that defendants cannot enforce against TGI in this case its arbitration agreement with AIM. In addition to the points already addressed, TGI contends that the AIM/TGI agreement reflects that the parties did not intend its enforcement by third parties. Specifically, in that agreement, AIM and TGI agreed that Swiss law would govern any and all arbitration proceedings. TGI submitted an unsworn memo to the Court stating that, under Swiss law, a non-signatory to a contract cannot compel an arbitration agreement therein. The Court cannot consider

the memo, which is nothing but an unsworn document of unknown provenance.

That said, TGI's contention about non-signatories' inability to enforce arbitration agreements under Swiss law appears to be correct. Though the Seventh Circuit has not addressed it, at least one circuit has ruled that Swiss law precludes non-signatories from enforcing arbitration agreements, with limited exceptions that are not relevant here. In a 2005 case, the Second Circuit ordered post-argument supplemental briefing to determine whether non-signatories could enforce arbitration agreements under Swiss law. The court eventually cited the highest court in Switzerland in holding that "under Swiss law, defendants, as non-signatories to the agreements, *may not* invoke the arbitration clauses contained in those agreements. *Motorola Credit Corp. v. Uzan*, 388 F.3d 39, 51 (2d Cir. 2004) (citing Swiss Federal Tribunal, decision of May 19, 2003, 4C.40/2003, No. 4.1). And although it did not depend on Swiss law for its holding, the Third Circuit similarly noted that Swiss law requires parties to be signatories to an arbitration agreement in order to enforce it. *See General Elec. Co. v. Deutz AG*, 270 F.3d 144, 155 (3d Cir. 2001) (noting that an ICC panel applying Swiss law held that a signatory to some parts of a contract, but not the arbitration agreement therein, was not entitled to arbitration under that agreement). In short, Swiss law—the agreed-upon law governing the arbitration provision in the TGI/AIM agreement—does not appear to permit third-party enforcement.

For these reasons, the Court declines to dismiss the case on the ground that TGI's claims are subject to arbitration.

3. *Forum non conveniens*

Defendants submit that, if for no other reason, the case should be dismissed

13

under the doctrine of *forum non conveniens*. *Forum non conveniens* is a discretionary doctrine that allows courts to dismiss actions involving foreign defendants if 1) there is an available and adequate alternative forum and 2) the balance of public and private interests weigh in favor of dismissal. *See, e.g., Clerides v. Boeing Co.*, 534 F.3d 623, 628 (7th Cir. 2008). Dismissal is appropriate if the plaintiff's chosen forum would disproportionately impose oppressiveness and vexation upon a defendant in exchange for the plaintiff's convenience. *Id*. Defendants argue that being forced to litigate this case in Illinois would unnecessarily inconvenience them and various witnesses. Further, they argue that there are compelling reasons to dismiss the case so that it may be litigated elsewhere, specifically in Germany or Switzerland. "A defendant invoking *forum non conveniens* ordinarily bears a heavy burden in opposing the plaintiff's chosen forum," particularly where, as in this case, it is the plaintiff's home forum. *Sinochem Int'l Co. v. Malaysia Int'l Shipping Corp.*, 549 U.S. 422, 430 (2007).

### a.    Alternative forums

Defendants argue that Germany and Switzerland are available and adequate forums.[1] They point to Germany because the parties met there, and many of the defendants' witnesses (along with the defendants themselves) are located there. They point to Switzerland because many of their proposed witnesses are located in Switzerland, and some of the dealings underlying the case took place there.

An alternative forum is adequate if "the parties will not be deprived of all

---

[1] TGI's agreement with N&M purportedly includes a forum selection provision specifying German courts, but a German court held in a different context that the provision was unenforceable. Defendants do not argue in connection with the present motion that the forum selection clause carries the day here or is a factor to be considered in the *forum non conveniens* analysis.

14

remedies or treated unfairly." *Fischer v. Magyar Allamvasutak Zrt.*, 777 F.3d 847, 867 (7th Cir. 2015). If a forum's statute of limitation bars a plaintiff's claims, that forum deprives the plaintiff of a remedy. In particular, "if a plaintiff's suit would be time-barred in the alternative forum, his remedy there is inadequate—is no remedy at all, in a practical sense . . . ." *Chang v. Baxter Healthcare* Corp., 599 F.3d 728, 736 (7th Cir. 2010). TGI contends that is the case here because the German and Swiss statutes of limitation on its claims have expired. Despite having the burden of persuasion on the *forum non conveniens* issue, defendants did not address this point in their opening brief; they simply contended that both Germany and Switzerland are available forums. In their reply, defendants attempt to reverse the burden of persuasion by arguing that TGI's evidence does not provide a basis for determining that the two proposed forums are unavailable due to the statute of limitations. Because it is defendants who have the burden of persuasion on the issue of *forum non conveniens*, the way they have addressed this point amounts to a concession, or a near-concession, that the statute of limitations has in fact run in both countries.

Defendants attempt to avoid the point by assuring the Court that they will waive this defense if the Court dismisses the case in favor of a foreign forum. But although defendants note that an expired statute of limitations does not preclude dismissal on *forum non conveniens* grounds if the defendant agrees to waive the defense, they do not acknowledge the second requirement of this exception: the alternative forum must be willing to enforce the waiver. *Fischer*, 777 F.3d at 862. Defendants have offered no assurance that the forums would enforce their waiver of a limitations defense—in fact, they have not even addressed the enforceability of such a waiver. The Court cannot

simply assume that the proposed alternative forums would enforce the defendants' waiver. Under the circumstances, the Court cannot say that there is an adequate alternative forum available.

Even were the defendants to waive the statute of limitations, and even had they shown that the proposed alternative forums would accept such a waiver, there is at least a question regarding whether an alternative forum is actually available. An alternative forum is "available if all parties are amenable to process and within the forum's jurisdiction." *Fischer v. Magyar Allamvasutak Zrt.*, 777 F.3d 847, 867 (7th Cir. 2015). A court in Germany dismissed a prior suit by N&M against TGI (alleging nonpayment) for lack of jurisdiction. *See* Defs.' Am. Mot. to Dismiss, Ex. 2B. Although the court's decision dealt primarily with the enforceability of a forum selection clause cited by N&M, it is less than clear that a German court would accept jurisdiction over a suit by TGI. Defendants likewise have not shown that they both would be within the jurisdiction of a Swiss court.

### b. Balance of interests

Given the absence of an available and adequate alternative forum, dismissal on the basis of *forum non conveniens* would be inappropriate, and the Court need not engage in the balancing of interests. But even were the Court to do so, the balance would not tip in favor of dismissal. In conducting the *forum non conveniens* analysis, courts balance both private and public interests. *See Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 508-09 (1947); *Clerides v. Boeing Co.*, 534 F.3d 623, 628 (7th Cir. 2008). The private interest factors include:

> the relative ease of access to sources of proof; availability of compulsory process for attendance of unwilling, and the cost of obtaining attendance

of willing, witnesses; possibility of view of premises, if view would be
appropriate to the action; and all other practical problems that make trial of
a case easy, expeditious and inexpensive.

*Clerides*, 534 F.3d at 628. The public interest factors include:

the administrative difficulties stemming from court congestion; the local
interest in having localized disputes decided at home; the interest in
having the trial of a diversity case in a forum that is at home with the law
that must govern the action; the avoidance of unnecessary problems in
conflicts of laws or in the application of foreign law; and the unfairness of
burdening citizens in an unrelated forum with jury duty.

*Id.* Regarding the private interest factors, defendants cite the location of documents and witnesses; on the public interest factors, they seem to contend that German law will apply.

These days business records are typically made or at least maintained digitally, and more importantly, they are nearly always *produced* digitally when litigation takes place. Thus records that are in western Europe are barely less accessible to a litigant in Illinois than they would be if they were in Illinois, and the converse is also true.[2] In this case, this is not a significant factor in the *forum non conveniens* analysis. *See generally Qurio Holdings, Inc. v. DISH Network Corp.*, No. 14 C 7504, 2015 WL 536002, at *3 (N.D. Ill. Feb. 9, 2015) (discussing the similar analysis under 28 U.S.C. §1404(a); citing *Bd. of Trs., Sheet Metal Workers' Nat'l Pension Fund v. Elite Erectors, Inc.*, 212 F.3d 1031, 1037 (7th Cir. 2000)).

With regard to the witnesses defendants cite, TGI legitimately disputes the significance of a good number of them. There are, however, at least a handful of

---

[2] In their reply, defendants make reference to Germany's "Data Protection Directive," which they say restricts international disclosure of certain types of data. But defendants make no effort to explain how, if at all, the Directive or any other restrictions Germany imposes on document production would affect discovery in this case, so they have effectively forfeited the point.

17

significant witnesses whose testimony likely is important who are outside the United States and therefore not subject to the Court's subpoena power. Some are parties (Giessler) or affiliated with parties, and those witnesses are likely to attend a trial even if the case remains here. Some are Chinese nationals; the appearance of those witnesses is no more likely in Europe than in the U.S. But this leaves at least some witnesses—though far fewer than defendants contend—whose appearance cannot be compelled here and who would be more likely to be able to appear at trial were the case tried in Europe. Those witnesses' depositions could be taken for trial purposes, but our legal system has a preference for live testimony. *See generally FTC v. Acquinity Interactive, LLC*, No. 2014 WL 37808, at *3 (N.D. Ill. Jan. 6, 2014) (Kennelly, J.). This factor weighs in favor of dismissal. That said, given the ubiquity of video depositions, the amount of weight properly given to this factor is less than in the "old" days when the norm was presentation of the cold record of a transcribed deposition.

Defendants also contend that German law governs TGI's agreement with N&M. That is anything but clear. Evidently an e-mail from N&M cited certain "terms and conditions" that appeared on its website, and these include a provision for application of German law. But TGI disputes that these terms and conditions were part of its agreement with N&M. At this point in the case, defendants have failed to establish— indeed they have not really tried to establish—that this provision is part of an enforceable contract between TGI and N&M.

There is "a strong presumption in favor of the plaintiff's choice of forum, which may be overcome only when the private and public interest factors clearly point towards trial in the alternative forum." *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 255-56 (1981).

18

And "a plaintiff's choice of forum is entitled to greater deference when the plaintiff has chosen the home forum." *Id.* at 266. That is the case here. Defendants seek to minimize TGI's Illinois presence and emphasize its foreign dealings. On the record before the Court, however, there is no question that TGI was and is an Illinois-based entity whose business operations are run from here and virtually all of whose employees work here, even if it has significant overseas dealings. There is no legitimate basis to discount its election to sue in its home forum.

The factors that defendants cite, specifically the location of non-party witnesses as discussed earlier, tilt somewhat toward dismissal in favor of a foreign forum. But that is insufficient to outweigh the significant deference properly given to TGI's choice to sue in its home forum. TGI is an Illinois company suing for conduct directed at this state that affected it here in Illinois. There is an appreciable public interest in providing a forum in this state in which TGI can seek redress for the alleged wrongdoing by the defendants.

For these reasons, defendants have failed to carry their "heavy burden" in opposing TGI's choice of its home forum. *Sinochem Int'l*, 549 U.S. at 430. The Court declines to dismiss this case under the doctrine of *forum non conveniens*.

## Conclusion

For the foregoing reasons, the Court denies defendants' motion to dismiss [dkt. no. 23]. Defendants are directed to answer the complaint by no later than March 29, 2016. Both sides are to make Rule 26(a)(1) disclosures by the same date. A status hearing is set for April 4, 2016 at 8:45 a.m., in chambers (Room 2188). Prior to that date, counsel are to discuss and attempt to agree upon a discovery and pretrial

19

schedule to propose to the Court.

_____
MATTHEW F. KENNELLY
United States District Judge

Date: March 8, 2016